

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

October 30, 2025

**BY ECF & EMAIL**

The Honorable Philip M. Halpern
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

  Re: *United States v. Anderson*, 25 Cr. 299 (PMH)

Dear Judge Halpern,

  The Government respectfully submits this letter in advance of the defendant Maurice Anderson's sentencing, currently scheduled for November 13, 2025. In the plea agreement, the parties stipulated to a sentencing range under the United States Sentencing Guidelines of 78 to 97 months' imprisonment (the "Stipulated Guidelines Range"). The U.S. Probation Office ("Probation") has correctly calculated the applicable Guidelines range to be 92 to 115 months' imprisonment. For the reasons below, the Government respectfully submits that a sentence at the top of the Stipulated Guidelines Range in the plea agreement would be sufficient but not greater than necessary to serve the purposes of sentencing.

**A. Factual Background**

  In May 2024, law enforcement began working with a confidential informant ("CI") to conduct controlled buys of guns. (Presentence Investigation Report ("PSR") ¶ 13.) In June 2024, the CI contacted Stanley Bruce (Anderson's co-conspirator), who indicated that he knew someone who could obtain a Draco (*i.e.*, a firearm that looks similar to an AK-47 and uses the same 7.62x39mm caliber ammunition). (PSR ¶¶ 5-7.)

<u>The June 25, 2024 Controlled Buy</u>

  On June 24, 2024, the day before the first controlled buy, the CI ran into Anderson outside of Bruce's apartment building. Anderson introduced himself to the CI as Bruce's "brother" and stated that he (Anderson) was supposed to sell a Draco to the CI but instead had sold it to someone else. The two then went into Bruce's apartment building, where Anderson showed the CI several firearms: a compact 9mm Glock 26 with an extended magazine capable of holding approximately 27-30 bullets, a chrome .40 caliber firearm, and a full-sized Glock. Anderson then offered to sell the CI a .22-caliber handgun with a silencer on it. While Anderson was away from the apartment, Bruce and the CI negotiated the purchase of 50 grams of crack cocaine for $1,000 and the .22 caliber handgun for approximately $500. (PSR ¶¶ 9-10.)

The next day, on June 25, 2024, Bruce indicated on a call with the CI that Anderson had given Bruce the .22-caliber handgun with the silencer. That evening, shortly after 6:58 p.m., the CI met at Bruce's apartment and in exchange for $1,500, the CI received two clear plastic bags with a combined weight of approximately 48.336 grams of crack cocaine and a .22-caliber Pietro Baretta Model 71, which had what appeared to be a silencer or suppressor attached to the barrel. The mother of Bruce's child also gave the CI a bag of ammunition that contained approximately 35 rounds of .25-caliber ammunition. (PSR ¶¶ 11-13.)

*The June 28, 2024 Controlled Buy*

On June 25, 2024, the CI communicated with Bruce via cellphone and arranged to purchase 50 grams of crack cocaine for $20 per gram, totaling $1,000. On June 28, 2024, the day of the controlled buy, Bruce advised the CI that Anderson planned to travel to an area near Atlanta, Georgia. The CI then ordered approximately 3-4 handguns, requesting that the caliber of the handguns be larger than .380 caliber and include "something that's going to spit," meaning something like a Draco or a MAC-10 (*i.e.*, Military Armament Corporation Model 10). (PSR ¶¶ 14-15.)

After the CI and Bruce completed the transaction for the crack cocaine, they continued to talk outside of Bruce's apartment building. The CI confirmed with Bruce that his order of "a big [firearm] and 2-3 small [firearms]" was still "good." Bruce reiterated that Anderson would be traveling to Decatur, Georgia—a suburb of Atlanta—to obtain the firearms. The CI reminded Bruce that the CI needed at least three to four guns, and that once a gun was used to "hit a n*gga," it would need to be discarded. Law enforcement understood "hit[ting]" to be referring to killing, shooting, or shooting at someone. (PSR ¶¶ 16-19.)

*The July 15, 2024 Controlled Buy*

On July 15, 2024, at around 8 p.m., the CI met Anderson in the hallway of Bruce's apartment building. There, the CI gave Anderson $600, and Anderson gave the CI a white bag containing a 9mm Glock 26 Gen 4, with a partially loaded extended magazine, another regular magazine, and a Ziplock bag containing more ammunition. (PSR ¶ 22.)

Afterwards, Bruce, Anderson and the CI, entered Bruce's apartment, where Bruce pulled out a silver Jimenez Arms Model J.A. 380 from a fanny pack he was wearing and gave it to the CI. The CI gave Bruce $600 for that firearm and an additional $200 for facilitating the hallway gun buy between the CI and Anderson. Bruce also gave the CI a handful of .380 bullets. Bruce advised that he had not had time to cook the approximately 100 grams of cocaine into crack cocaine, but the CI took the clear plastic bag with 99.592 grams of cocaine as is and gave Bruce $2,200. Before leaving the apartment, the CI reminded Bruce that he needed the 3-4 guns he had asked for previously to commit robberies of four houses. Anderson was in another room of the apartment at the time the cocaine was purchased. (PSR ¶¶ 23-24.)

*The August 2, 2024 Search of Anderson's Apartment and Vehicle*

On August 2, 2024, law enforcement arrived at Anderson's home to arrest him pursuant to an arrest warrant issued in the instant case. When law enforcement knocked on his door, Anderson immediately texted one or more of his co-conspirators that the "Feds" were at his door, thus

alerting them that law enforcement may be investigating them or enroute to arrest them. Anderson consented to a search of his residence and vehicle. From that search, law enforcement recovered a High Standard .22 caliber Sport King, which was unloaded, rusted, and not in working condition at the time; 11 rounds of .22 long-rifle ammunition; bags containing a green leafy substance that appeared to be marijuana; scales; and two bottles of promethazine. (PSR ¶ 29.)

In October 2024, law enforcement learned from the CI that separate and apart from the controlled buys of firearms, the CI had purchased a .40 caliber Smith & Wesson from Anderson on June 24, 2024 for his own personal use. (PSR ¶ 29.)

**B.  Procedural History and Guidelines Calculation**

As described above, Anderson was arrested on August 2, 2024, pursuant to a twelve-count Complaint charging him in Count Seven with using and carrying a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); Counts Nine and Eleven with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1); and Count Twelve with unlicensed firearm dealing, in violation of 18 U.S.C. § 922(a)(1)(A). (*See* Dkt. No. 2, Complaint.) On the same day, Anderson was presented before the Honorable Judith C. McCarthy, United States Magistrate Judge for the Southern District of New York, and ordered detained. (Minute Entry on August 2, 2024.)

On July 1, 2025, pursuant to a plea agreement, Anderson pled guilty before the Court to an Information charging the defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (*See* PSR ¶ 1.) The parties' plea agreement correctly calculated Anderson's offense level, but incorrectly calculated Anderson's criminal history as III and resulting Stipulated Guidelines Range as 78-97).[1] The parties agree that Probation's Guidelines calculation in the PSR is correct, and that the applicable Guidelines Range is 92 to 115 months' imprisonment calculated on the basis of an offense level of 26—with a base offense level of 22 for the defendant having a prior felony conviction and the offense involving a firearm that is capable of accepting a large-capacity magazine; plus 2 levels for the number of firearms involved in the offense being between three and seven; plus 5 levels because the defendant understood that the guns that the CI was attempting to buy would be used for a robbery; and a reduction of three levels for acceptance of responsibility—and a Criminal History Category of IV, calculated using the November 2024 edition of the Guidelines Manual. (PSR ¶¶ 33-59; 122.)

---

[1] The parties erred in calculating the Guidelines range with respect to Anderson's criminal history points because they assessed only three points to the defendant's 2012 federal convictions. Pursuant to U.S.S.G. § 4A1.1(d), because Anderson's 2012 federal convictions included pleading guilty to three Hobbs Act robberies, each of which was "a conviction of a crime of violence that did not receive any points . . . because such sentence was treated as a single sentence," Anderson's criminal history should have included an additional three points (for a total of six points), thereby increasing Anderson's criminal history category to IV. (*See* PSR ¶ 123.)

### C.  Probation and Defense Counsel's Recommended Sentences

Probation recommends a sentence of 92 months' imprisonment—the bottom of the applicable Guidelines range—based on the seriousness of the offense conduct and the lack of "any mitigating factors that are sufficient to override the seriousness of the instant offense as well as the extent of the defendant's criminal history." (PSR at 36-37.)

Anderson seeks a sentence below the Stipulated Guidelines Range of 78 to 97 months, because of, among other things, the defendant's difficult upbringing, which included an alcoholic and largely absent father, as well as a mother who regularly used marijuana and abused the defendant; his own long history of drug use; his devotion to his own children; and his ability to generally hold steady employment and potential for rehabilitation. Defendant's Sentencing Submission ("Def. Sub.") 9-14.

### D.  Discussion

#### 1.  Applicable Law

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence for criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Sentence At the Top of the Stipulated Guidelines Range Is Appropriate[2]

The Government respectfully submits that a sentence at the top of the Stipulated Guidelines Range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing, including the need to reflect the seriousness of the offense, promote general and specific deterrence for future criminal conduct, promote respect for the law, protect the public, and account for the defendant's characteristics and history.

*First*, a sentence at the top of the Stipulated Guidelines Range would reflect the nature and seriousness of the offense. Gun violence is a terrible scourge on the communities in the Southern District of New York, especially in Yonkers. Anderson contributed to that scourge by selling not just a single gun, but five guns: the three firearms sold to the CI as part of the controlled buys; the firearm Anderson sold to the CI for the CI's personal use; and, in a conversation with the CI, Anderson stated that he didn't sell a Draco to the CI because Anderson had sold it to another buyer. Moreover, on the day of his arrest, a sixth gun was found in Anderson's residence. If that were not enough, when the CI indicated that he needed 3-4 more guns for a set of robberies, Bruce indicated he would do what he could to acquire the guns through Anderson. A recording of a phone conversation between the CI, Bruce, and Anderson, shows that Anderson was clearly aware of the fact that the 3-4 guns were intended to be used as part of robberies. In short, the sales to the CI were not one-off deals, but part of a larger gun-trafficking business that endangered the wider Yonkers community and were *intended* to be used to facilitate criminal conduct.

*Second*, a sentence at the top of the Stipulated Guidelines Range is necessary to promote respect for the law, protect the community, and adequately deter Anderson and others. Anderson has a long criminal history, with no fewer than four state convictions for petit larceny, driving while intoxicated, and disorderly conduct. His criminal history also includes convictions on seven counts in the Southern District of New York for conspiracy to distribute drugs, possession of a firearm in furtherance of a drug trafficking offense, conspiracy to commit Hobbs Act robberies, three Hobbs Act gunpoint robberies, and aiding and abetting the use of a firearm in relation to a crime of violence. He committed the instant offense after having served almost 3 years in prison. In other words, for the time that he has spent at liberty, he has shown no respect for the law and was not deterred, despite facing very serious time, from committing serious crimes involving guns.[3] A sentence at the top of the Stipulated Guidelines Range would promote respect for the law,

---

[2] Pursuant to p. 4 of the Plea Agreement, the parties may "seek an appropriately adjusted Guidelines range if it is determined based upon information not contained in this Agreement that the defendant's criminal history category is different from that set forth above." Nonetheless, the Government respectfully submits that a sentence at the high end of the Stipulated Guidelines Range, which overlaps with the bottom of the applicable Guidelines range, would be appropriate.

protect the community from guns, and help deter Anderson and others who contemplate illegally trafficking firearms.

*Third*, a sentence at the top of the Stipulated Guidelines Range would take into account Anderson's characteristics and history. The Government recognizes that Anderson had a difficult childhood with an alcoholic father and a drug addicted mother, has himself suffered from drug addiction and financial instability, and has shown a devotion to his family and the ability to hold legitimate employment. However, like Probation, the Government believes that these factors do not offset the seriousness of his conduct, his blatant lack of respect for the law, the need to deter those who think about trafficking firearms, and the need to protect the community from deadly firearms.

In sum, a sentence at the top of the Stipulated Guidelines Range would adequately balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

**E. Conclusion**

For the reasons set forth above, the Court should impose a sentence of imprisonment at the top of the Stipulated Guidelines Range.[4]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:   /s/
Timothy Ly
Assistant United States Attorney
Tel: (212) 637-1062

Cc:   James Neumann, Esq.

---

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court imposes, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).